UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MICHAEL FISHER,

                Plaintiff,

v.

ALLISON MELINOWSKI et al.,

                Defendants.

_____/

Case No. 1:25-cv-315

Honorable Ray Kent

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). The Court will grant Plaintiff leave to proceed *in forma pauperis*. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge. (ECF No. 5, PageID.33; ECF No. 10, PageID.67.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States Magistrate Judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will partially dismiss Plaintiff's amended complaint[2] for failure to state a claim as detailed below. Plaintiff's request for the appointment of counsel (ECF No. 10, PageID.65) will be denied.

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

[2] By order entered on June 11, 2025, the Court granted Plaintiff leave to file an amended complaint to correct several deficiencies in the original complaint, which the Court had detailed in its June 11, 2025, order. (Order, ECF No. 9.) The Court directed Plaintiff to file his amended complaint within twenty-one days of the date of the order. (*Id.*, PageID.52.) In response, Plaintiff filed an amended complaint, which he signed on June 25, 2025, and which the United States Postal Service postmarked on June 30, 2025. (Am. Compl., ECF No. 10, PageID.67, 68.)

## Discussion

I.     **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events about which he complains occurred at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan, as well as at Carson City Hospital and McLaren Hospital, both of which are offsite, non-MDOC hospitals. (*See* Am. Compl., ECF No. 10.) Plaintiff sues the following DRF staff: Nurse Allison Melinowski, Sergeant Unknown Leonard, Sergeant Unknown Reno,[3] and Nurse Unknown Party #1. (*Id.*, PageID.66.) Plaintiff also sues Carson City Hospital Nurse Unknown Party #2. (*Id.*) Plaintiff sues Defendants in their individual and official capacities. (*See id.*)

In Plaintiff's amended complaint, he alleges that on March 13, 2022, he was experiencing "really bad acid reflux, which caused [dis]comfort and chest pains."[4] (*Id.*, PageID.55.) Plaintiff's cellmate, inmate Jackson, was concerned about Plaintiff's wellbeing, telling Plaintiff that Jackson's "mother had a heart attack at any early age." (*Id.*) Inmate Jackson advised non-party Correctional Officer Lott about the matter, and "Lott called medical." (*Id.*) Plaintiff then spoke to "medical . . . via phone." (*Id.*) Plaintiff told the unnamed, non-party nurse on the phone that "after eating lunch [he] was having really bad acid reflux and [dis]comfort in [his] chest area." (*Id.*) The

---

[3] Although Plaintiff lists Sergeant Reno in his list of Defendants in the amended complaint; in a different portion of the amended complaint, Plaintiff states that he asks the Court "to drop" Defendant Reno because Plaintiff "realized it would be difficult to prove a deprivation of rights." (Am. Compl., ECF No. 10, PageID.65, 66.) Under these circumstances, Plaintiff's intentions regarding Sergeant Reno are unclear, and out of an abundance of caution, the Court considers Defendant Reno to be named as a Defendant in the amended complaint.

[4] In this opinion, the Court corrects the punctuation and capitalization in quotations from Plaintiff's filings.

unnamed, non-party nurse told Plaintiff "to fill out [a] healthcare request form." (*Id.*) Thereafter, non-party Correctional Officer Lott told inmate Jackson "to push Plaintiff to medical in a wheelchair." (*Id.*) Plaintiff states that "at no time did [he] feel that [he] was having a heart issue"; instead, Plaintiff thought he was going to the healthcare unit for "some much needed heartburn medicine." (*Id.*)

Upon arrival at the healthcare waiting room, Defendant Correctional Officer Leonard "made Plaintiff stand up." (*Id.*, PageID.56.) Plaintiff alleges that Defendant Leonard then handcuffed "Plaintiff in [an] aggressive manner." (*Id.*) Inmate Jackson was also handcuffed. (*Id.*) Defendant Leonard and other unnamed, non-party correctional officers searched Plaintiff's pockets, and Defendant Leonard stated: "We're done playing these f**cking games." (*Id.* (asterisks in original).) "Plaintiff and [inmate] Jackson were [then] escorted to [the] control center." (*Id.*) Defendant Leonard took Plaintiff into a windowless room, and stated: "you know anything happens in here, it's my word against yours, right?" (*Id.*) Plaintiff told Defendant Leonard that Plaintiff "wasn't looking for any problems," and that he "was at medical for chest pains." (*Id.*) Defendant Leonard then "got directly in Plaintiff[']s face and threatened Plaintiff saying, 'quit playing these f**cking games or you're gonna get your a** beat.'" (*Id.* (asterisks in original).) At some unspecified time during this interaction, Plaintiff was "ordered to a strip search by Leonard." (*Id.*) Subsequently, Defendant Leonard ordered Plaintiff to return to his housing unit. (*Id.*) Plaintiff asked Defendant Leonard "what about medical," and in response, Defendant Leonard told Plaintiff "no, get out of here." (*Id.*)

When Plaintiff returned to his housing unit, he laid down on his bunk. (*Id.*) Shortly thereafter, non-party Correctional Officer Lott came to Plaintiff's cell and told Plaintiff that he had

"to go to [the] outside hospital." (*Id.*) Plaintiff alleges that non-party Correctional Officer Lott reported that "[Defendant] Nurse Melinowski sa[id] [Plaintiff] swallowed something." (*Id.*)

Upon arrival at the healthcare unit, Defendant Melinowski asked Plaintiff "what did you swallow?" (*Id.*) Defendant Melinowski also asked, "was it fent[any]l?" (*Id.*, PageID.57.) Defendant Leonard was present during this interaction, and Plaintiff claims that he "had a bad vibe, as if Leonard and Melinowski had been plotting against Plaintiff." (*Id.*) Plaintiff told Defendant Melinowski that he had not "swallow[ed] any drugs." (*Id.*) Defendant Melinowski advised Plaintiff that he would still be transported to an outside hospital. (*Id.*)

Thereafter, Plaintiff claims that Defendant Melinowski was "all over Plaintiff with questions, blood pressure cuff on arm, [and] taking temperature." (*Id.* (phrasing in original).) Defendant Melinowski then stated that an IV would be started. (*Id.*) Plaintiff contends that "at this point, Melinowski [wa]s all over the place" and "in a frantic state," and Melinowski asked Defendant Nurse Unknown Party #1 to start the IV. (*Id.*) Plaintiff was instructed to lay down on the nursing table, and Plaintiff alleges that Defendant Unknown Party #1 "[wa]s poking around [with the IV needle] as if incompetent." (*Id.*)

After the IV was started in Plaintiff's arm, Defendant Melinowski kept asking Plaintiff if he was "okay" and saying "you can tell me what you took." (*Id.*, PageID.58.) Defendant Melinowski then advised Plaintiff that she was going to "flush [the] IV" with a "saline solution." (*Id.*) Plaintiff claims that as Defendant Melinowski inserted the "saline syringe" in the IV, she "intentionally [wa]s forcing air into [the] vein of Plaintiff." (*Id.*) Specifically, Plaintiff claims that as Defendant Melinowski "pulled back on [the] syringe," this caused "an air bubble" to draw up inside the syringe." (*Id.*, PageID.59.) Plaintiff also claims that Defendant Unknown Party #1 told Defendant Melinowski "you can't do that, there is air in the syringe." (*Id.*) Plaintiff believes that

Defendant Melinowski acted "with [an] intent to murder/kill/cause harm by putting her arm against Plaintiff's body while using force to push down on [the syringe] plunger." (*Id.*, PageID.58.) And, Plaintiff believes that "these people," presumably the Defendants present during this incident, "conspired to actually murder [him]." (*Id.*, PageID.59.)

Plaintiff states that at he was experiencing nausea, "extreme lightheadedness," and "trouble catching [his] breath." (*Id.*, PageID.60.) At some point, Defendant Melinowski turned on the defibrillator, but the emergency medical technicians arrived at DRF and transported Plaintiff to Carson City Hospital before Defendant Melinowski used the defibrillator. (*Id.*, PageID.59, 60.)

Upon arrival at Carson City Hospital, Plaintiff "asked to speak with a patient advocate." (*Id.*, PageID.61.) Defendant Unknown Party #2 identified himself as the patient advocate nurse at Carson City Hospital, and Plaintiff told Defendant Unknown Party #2 that he believed the nurse at DRF had tried to kill him. (*Id.*) In response, Defendant Unknown Party #2 stated: "Don't say that; no one is trying to kill you." (*Id.*)

At Carson City Hospital, a number of tests were run on Plaintiff, including "lab blood draws" and an "EKG," and Narcan, "an opio[i]d overdose reversal drug," was administered to Plaintiff. (*Id.*, PageID.61–62.) Plaintiff alleges that staff at Carson City Hospital "were very rude, impatient, apathetic and/or judgmental to Plaintiff," and insisted that Plaintiff "was under [the] influence of drugs." (*Id.*, PageID.62.) At some point, an unnamed, non-party nurse told Plaintiff that the EKG showed that "something [was not] right with [his] heart because [it was not] beating fast enough." (*Id.*) In light of this, Plaintiff was then "rushed" to McLaren Hospital in Lansing. (*Id.*, PageID.62. 63.) At McLaren Hospital, Plaintiff "had pacemaker surgery." (*Id.*, PageID.63.)

On March 18, 2022, Plaintiff returned to DRF. (*Id.*) At DRF, Plaintiff was assigned to the same cell and the same top bunk as he was previously assigned, "despite requesting [a] bottom

bunk." (*Id.*) Additionally, upon Plaintiff's return to DRF, he filed grievances against Defendants Leonard and Melinowski regarding the events that occurred on March 13, 2022. (*Id.*) Plaintiff did not receive a response to his grievances. (*Id.*)

On April 13, 2022, Defendant Leonard called Plaintiff to the officer's desk in the unit, and asked: "What's it gonna take? Take a look around, nobody gives a f*ck about you! You see these [correctional officers], they got my back; anything I say, they're going to go with it." (*Id.* (asterisk in original).) At that time, Defendant Reno was holding Plaintiff's grievance, and Reno stated: "What, are you signing off or what?" (*Id.*) Plaintiff said that he did not want any problems, and Defendant Leonard stated: "I can't tell you keep writing all these stupid ass grievances." (*Id.*) "Plaintiff took this whole display as a threat." (*Id.*) Plaintiff then signed off on the grievance. (*Id.*)

On May 26, 2022, Plaintiff was placed in segregation,[5] and he "wrote every single person from Warden Rewerts to Inspector Williams, [both of whom are non-parties to this action], explaining that the grievance coordinator [wa]s not complying with grievance policies [and] procedures." (*Id.*, PageID.64.)

Based on the foregoing allegations, Plaintiff avers that Defendants violated his rights under the Eighth Amendment to the United States Constitution. (*Id.*, PageID.55.) Without providing any explanation, Plaintiff also references the ADA and the RA, and as such, the Court construes Plaintiff's amended complaint to present ADA and RA claims. (*Id.*) The Court also construes Plaintiff's amended complaint to raise additional § 1983 claims, alleging violations of his rights under the First Amendment as related to Defendants Leonard's and Reno's alleged threats regarding Plaintiff signing off on his grievances, under the Fourth Amendment as related to

---

[5] Plaintiff raised claims regarding the events surrounding Plaintiff's placement in segregation on May 26, 2022, in a separate action in this Court, which remains pending as of the date of this opinion. *See Fisher v. Rewerts et al.*, No. 1:24-cv-917 (W.D. Mich.).

Defendant Leonard's strip search of Plaintiff's person, and under the Fourteenth Amendment as related to Plaintiff's use of the grievance procedure at DRF. Additionally, the Court construes Plaintiff's amended complaint to raise § 1983 civil conspiracy claims.[6] Plaintiff seeks monetary damages and injunctive relief. (*Id.*, PageID.55, 67.)

## II.    Request for the Appointment of Counsel

In Plaintiff's amended complaint, he requests the appointment of counsel. (ECF No. 10, PageID.65.)

Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and has determined that, at this time, the assistance of counsel is not necessary to the proper presentation of Plaintiff's position. Plaintiff's request for the appointment of counsel therefore will be denied.

---

[6] At the end of Plaintiff's amended complaint, Plaintiff briefly describes several issues that he is facing during his current confinement at MBP. (*See* Am. Compl., ECF No. 10, PageID.65.) The present action proceeds against the named Defendants at DRF regarding events at DRF that are related to Plaintiff's cardiac incident in March of 2022. Any claims regarding Plaintiff's present confinement are not properly brought in this action. As such, the Court does not construe Plaintiff's brief summary of several issues at MBP to raise any claims regarding these events in the present action.

### III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Section 1983 Claims

### 1.    Defendant Unknown Party #2

Plaintiff identifies Defendant Unknown Party #2 as a nurse at Carson City Hospital, and Plaintiff describes Carson City Hospital as an offsite "local" hospital. (Am. Compl., ECF No. 1, PageID.66.)

In order for a private party's conduct to be under color of state law, it must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Street*, 102 F.3d at 814. There must be "a sufficiently close nexus between the State and the challenged action of [the defendant] so that the action of the latter may be fairly treated as that of the State itself." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Where the defendants are not state officials, their conduct will be deemed to constitute state action only if it meets one of three narrow tests. The first is the symbiotic relationship test, or nexus test, in which the inquiry focuses on whether "the State had so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jackson*, 419 U.S. at 357–58. Second, the state compulsion test describes situations "in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *NBC v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1026 (11th Cir. 1988); *accord Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170 (1970). Finally, the public function test covers private actors performing functions "traditionally the exclusive prerogative of the State." *Jackson*, 419 U.S. at 353; *accord West*, 487 U.S. at 49–50. *See generally*, *Lugar*, 457 U.S. at 936–39 (discussing three tests).

Plaintiff has not presented any allegations by which the conduct of Defendant Unknown Party #2 could be fairly attributed to the State. Accordingly, Plaintiff fails to state a § 1983 claim against Defendant Unknown Party #2.

### 2.    Official Capacity Claims

Plaintiff sues Defendants Melinowski, Leonard, Reno, and Unknown Party #1 in their individual and official capacities. (Am. Compl., ECF No. 10, PageID.66.)

A suit against an individual in his or her official capacity is equivalent to a suit against the governmental entity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

### a.    Defendants Employed by the MDOC

As to any Defendants employed by the MDOC, Plaintiff's official capacity claims against these Defendants are equivalent to claims against the MDOC.

The states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). And, regardless, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will*, 491 U.S. at 66); *Harrison*, 722 F.3d at 771.

Here, Plaintiff seeks monetary damages and injunctive relief. (Am. Compl., ECF No. 10, PageID.55, 67.) However, as noted above, the MDOC is not a "person" who may be sued under

§ 1983 for money damages. *See, e.g.*, *Lapides*, 535 U.S. at 617. Similarly, Plaintiff may not seek monetary damages against Defendants in their official capacities. *Will*, 491 U.S. at 71 ("We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.").

Although damages claims against official capacity defendants are properly dismissed, an official capacity action seeking prospective injunctive or declaratory relief is not treated as an action against the state. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)). The *Ex parte Young* doctrine "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign immunity purposes." *Va. Ofc. for Prot. and Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (internal citation omitted.) The Supreme Court has cautioned that, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). In the present action, Plaintiff's allegations against the named Defendants relate solely to past harm, not future risk of harm. Therefore, Plaintiff does not seek relief properly characterized as prospective, and his claims do not fit within the *Ex parte Young* exception. *See Ladd*, 971 F.3d at 581.

Moreover, the United States Court of Appeals for the Sixth Circuit has held that transfer to another correctional facility moots a prisoner's injunctive and declaratory claims. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that a prisoner-plaintiff's claims for injunctive and declaratory relief became moot when the prisoner was transferred from the prison about which he complained); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990); *Williams v. Ellington*, 936 F.2d 881

13

(6th Cir. 1991). Here, Plaintiff is no longer confined at DRF, which is where he avers that Defendants are employed. Thus, Plaintiff cannot maintain his claims for injunctive relief against Defendants.

Accordingly, for the reasons set forth above, Plaintiff has failed to state a claim against any Defendants employed by the MDOC in their official capacities upon which relief may be granted, and his official capacity claims against any Defendants employed by the MDOC will be dismissed for failure to state a claim.

### b.    Defendants Employed by a Prison Medical Provider that Contracts With the State

With respect to any Defendants employed by a private entity that contracts with the state to provide healthcare to inmates, Plaintiff's official capacity claims are equivalent to a suit against the private entity. A private entity that contracts with a governmental entity to perform a traditional governmental function like providing healthcare to inmates can "be sued under § 1983 as one acting 'under color of state law.'" *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (quoting *West*, 487 U.S. at 54). The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983. *See Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), has been extended to private corporations); *Street*, 102 F.3d at 817–18 (same); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (same); *Cox v. Jackson*, 579 F. Supp. 2d 831, 851–52 (E.D. Mich. 2008) (same).

"Under 42 U.S.C. § 1983, while a municipality can be held liable for a constitutional violation, there is no vicarious liability based on the acts of its employees alone." *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020) (citing *Monell*, 436 U.S. 690–91). Instead, a municipality "can be sued under § 1983 only when a policy or custom of that government caused the injury in

question." *Id.* (citations omitted). "[T]he finding of a policy or custom is the initial determination to be made in any municipal liability claim." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). Further, the policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)); *Claiborne Cnty.*, 103 F.3d at 508–09.

A policy includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the entity. *See Monell*, 436 U.S. at 690. Moreover, the United States Court of Appeals for the Sixth Circuit has explained that a custom "for the purposes of *Monell* liability must be so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne Cnty.*, 103 F.3d at 507. "In short, a 'custom' is a 'legal institution' not memorialized by written law." *Id.*

Here, Plaintiff fails to allege that any policy or custom was the moving force behind his alleged constitutional injury. Where a plaintiff fails to allege that a policy or custom existed, dismissal of the action for failure to state a claim is appropriate. *Rayford v. City of Toledo*, No. 86-3260, 1987 WL 36283, at *1 (6th Cir. Feb. 2, 1987). Furthermore, even liberally construing Plaintiff's amended complaint, as the Court is required to do, even if Plaintiff intended to suggest the existence of a custom, his allegations are wholly conclusory. *Cf. Bilder v. City of Akron*, No. 92-4310, 1993 WL 394595, at *2 (6th Cir. Oct. 6, 1993) (affirming dismissal of § 1983 action when plaintiff allegation of policy or custom was conclusory, and plaintiff failed to allege facts tending to support the allegation). Accordingly, because Plaintiff fails to allege the existence of a policy or custom of the private entity, Plaintiff's official capacity claims against any Defendants

15

employed by a private entity that contracts with the state to provide healthcare to inmates will be dismissed.

### 3.    First Amendment Retaliation Claims

The Court construes Plaintiff's amended complaint to raise First Amendment claims as related to Defendants Leonard's and Reno's alleged threats regarding Plaintiff signing off on his grievances. (*See* Am. Compl., ECF No. 10, PageID.63.)

As relevant to Plaintiff's First Amendment retaliation claims, Plaintiff alleges that on April 13, 2022, Defendant Leonard called Plaintiff to the officer's desk in the unit, and asked: "What's it gonna take? Take a look around, nobody gives a f*ck about you! You see these [correctional officers], they got my back; anything I say, they're going to go with it." (*Id.* (asterisk in original).) At that time, Defendant Reno was holding Plaintiff's grievance, and Reno stated: "What, are you signing off or what?" (*Id.*) Plaintiff said that he did not want any problems, and Defendant Leonard stated: "I can't tell you keep writing all these stupid ass grievances." (*Id.*) "Plaintiff took this whole display as a threat." (*Id.*) Plaintiff then signed off on the grievance. (*Id.*)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) she was engaged in protected conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to show that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

With respect to the first element of a First Amendment retaliation claim, an inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298–99 (3d Cir. 2016). Here, Plaintiff alleges that he filed grievances about the events in March of 2022 as related to his cardiac incident.

Next, as to the second element of a First Amendment retaliation claim, Plaintiff alleges that Defendants Leonard and Reno took adverse action against him by verbally threatening him. (*See* Am. Compl., ECF No. 10, PageID.63.) A specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g.*, *Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results).

In this action, although Plaintiff alleges that he "took this whole display [i.e., the statements of Defendants Leonard and Reno, which are set forth above,] as a threat," a review of the statements attributed to Defendants Leonard and Reno show that Defendants' statements were vague and did not set forth a specific threat of harm. (Am. Compl., ECF No. 10, PageID.63.) Furthermore, although Plaintiff states that he ultimately signed off on the grievances (*see id.*), the standard for stating the second element of a First Amendment retaliation claim is whether a person of ordinary firmness would be deterred from exercising his or her First Amendment rights. The fact that Plaintiff was so deterred is not dispositive. Indeed, based on the facts alleged by Plaintiff in the amended complaint, the Court concludes that the statements attributed to Defendants Leonard and Reno on April 13, 2022, were vague and lacking in specificity, and would not deter a person of ordinary firmness from exercising his or her First Amendment rights. *See, e.g.*, *Hardy*

*v. Adams*, No. 16-2055, 2018 WL 3559190, at *3 (6th Cir. Apr. 13, 2018) ("The alleged threat by Adams that she would make Hardy's life 'hell' is simply too vague to pass this threshold.").

Accordingly, the Court will dismiss any intended First Amendment retaliation claims against Defendants Leonard and Reno for failure to state a claim.

### 4.    Fourth Amendment Claims

Plaintiff alleges that Defendant Leonard conducted a strip search of Plaintiff's person on March 13, 2022. (Am. Compl., ECF No. 10, PageID.56.) Although Plaintiff does not specifically indicate that he is bringing a claim about the strip search, generously construing Plaintiff's *pro se* filings, the Court construes Plaintiff's amended complaint to raise a Fourth Amendment claim regarding the strip search.

Both the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have recognized that, under the Fourth Amendment, prisoners and detainees may be subjected to strip searches and body-cavity searches without individualized suspicion. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 333–34 (2012) (rejecting the argument that correctional officials need reasonable suspicion to conduct visual body-cavity searches upon inmates at the time they are admitted to the general jail population); *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) (noting that "suspicionless strip searches [are] permissible as a matter of constitutional law"); *see also Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 529 (6th Cir. 2016). Nevertheless, a strip search "may be unreasonable by virtue of the way in which it is conducted." *Williams v. City of Cleveland*, 771 F.3d 945, 952 (6th Cir. 2014) (citing *Stoudemire*, 705 F.3d at 574). In determining the reasonableness of a search, "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Stoudemire*, 705 F.3d at 572 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

Here, Plaintiff's allegations in the amended complaint show that DRF staff suspected that he had consumed drugs on March 13, 2022. (*See generally* Am. Compl., ECF No. 10.) Plaintiff denies this; however, Plaintiff's allegations plainly show that nurses and correctional officers at DRF, including Defendant Leonard, suspected Plaintiff of consuming drugs on that date. (*See id.*) Plaintiff alleges that Defendant Leonard conducted a strip search of Plaintiff's person in a private room away from other prisoners. Although it is clear that Plaintiff believes that Defendant Leonard should not have conducted the strip search, Plaintiff alleges no facts to suggest that the strip search was conducted in an unreasonable manner. Under these circumstances, based on the facts alleged in the amended complaint, Plaintiff fails to state a Fourth Amendment claim against Defendant Leonard regarding the March 13, 2022, strip search.

### 5.  Eighth Amendment Claims

#### a.  Verbal Harassment Claims Against Defendants Leonard and Reno

The Court construes Plaintiff's amended complaint to raise Eighth Amendment claims regarding alleged verbal harassment by Defendants Leonard and Reno. (*See, e.g.*, Am. Compl., ECF No. 10, PageID.56, 63.)

As to any intended Eighth Amendment claims premised on verbal harassment, the Court does not minimize Plaintiff's experience; however, although unprofessional, allegations of verbal harassment or taunts by prison officials toward an inmate do not constitute punishment within the meaning of the Eighth Amendment. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) (per curiam). And, allegations of verbal harassment also do not rise to the level of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *See id.*; *see Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (holding that harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits).

Accordingly, Plaintiff fails to state an Eighth Amendment claim premised on verbal harassment.

### b.    Use of Force Claims

Plaintiff alleges that upon his initial arrival at the healthcare waiting room on March 13, 2022, Defendant Correctional Officer Leonard "made Plaintiff stand up" out of the wheelchair, and Plaintiff alleges that Defendant Leonard then handcuffed "Plaintiff in [an] aggressive manner." (Am. Compl., ECF No. 10, PageID.56.) Generously construing Plaintiff's *pro se* complaint, the Court construes Plaintiff's amended complaint to raise an Eighth Amendment claim regarding Defendant Leonard's alleged handcuffing of Plaintiff "in [an] aggressive manner."

As relevant to excessive force claims, the Eighth Amendment prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)). Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification." *Id.* However, not every shove or restraint gives rise to a constitutional violation. *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986); *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "On occasion, '[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law.'" *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002)). Prison officials nonetheless violate the Eighth Amendment when their "offending conduct reflects an unnecessary and wanton infliction of pain." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)); *Bailey v. Golladay*, 421 F. App'x 579, 582 (6th Cir. 2011).

There is an objective component and a subjective component to this type of Eighth Amendment claim. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v.*

*McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). First, "[t]he subjective component focuses on the state of mind of the prison officials." *Williams*, 631 F.3d at 383. Courts ask "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. Second, "[t]he objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). The objective component requires a "contextual" investigation that is "responsive to 'contemporary standards of decency.'" *Id.* at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Although the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

Here, Plaintiff alleges that on March 13, 2022, Defendant Leonard handcuffed "Plaintiff in [an] aggressive manner." (Am. Compl., ECF No. 10, PageID.56.) Based on the other facts alleged in the amended complaint, it is clear that at the time of this interaction between Defendant Leonard and Plaintiff, Defendant Leonard suspected Plaintiff of either currently possessing, or previously consuming, drugs. (*See, e.g.*, *id.*) Besides alleging in a conclusory manner that Defendant Leonard placed the handcuffs on Plaintiff "in [an] aggressive manner," Plaintiff alleges no other facts to support this claim. (*Id.*) Indeed, the scant facts alleged by Plaintiff regarding this incident suggest

that placing Plaintiff in handcuffs was not unreasonable, nor violative of the contemporary standards of decency. *See Hudson*, 503 U.S. at 8. Simply put, Plaintiff's conclusory allegation without supporting facts is insufficient to state an Eighth Amendment excessive force claim against Defendant Leonard. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

### c.    Medical Care Claims

Plaintiff alleges that Defendants Melinowski, Unknown Party #1, and Leonard violated his Eighth Amendment rights by providing inadequate medical treatment as related to his cardiac incident, which occurred at DRF on March 13, 2022. (*See generally* Am. Compl., ECF No. 10.)

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes, U.S. Const. amend. VIII, and the Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.*

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with

22

knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the United States Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th

Cir. 2014); *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, . . . he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). The prisoner must show that the care the prisoner received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

As to the objective component, for the purposes of this opinion, the Court will assume, without deciding, that Plaintiff's allegations regarding the March 13, 2022, cardiac incident, which resulted in Plaintiff being transported to an offsite hospital for pacemaker surgery, satisfy the objective component of the relevant two-prong test.

Turning to the subjective component—i.e., the requirement that a plaintiff alleges sufficient facts to show that "the official [or medical provider was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official or medical provider "also dr[e]w the inference," *Farmer*, 511 U.S. at 837—the Court addresses Plaintiff's allegations against Defendants Melinowski, Unknown Party #1, and Leonard below.

### 1.    *Defendants Melinowski and Unknown Party #1*

Plaintiff alleges that on March 13, 2022, he was experiencing "really bad acid reflux, which caused [dis]comfort and chest pains." (Am. Compl., ECF No. 10, PageID.55.) On that date,

Plaintiff first interacted with Defendants Melinowski and Unknown Party #1, both of whom Plaintiff identifies as nurses at DRF, the second time that Plaintiff was brought to healthcare, which was after he was suspected of consuming drugs. (*Id.*, PageID.56.) Plaintiff denies consuming any drugs; however, this concern regarding Plaintiff's potential drug consumption is relevant in determining whether Defendants Melinowski and Unknown Party #1 were deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff alleges that upon arrival at DRF's healthcare unit, Defendant Melinowski asked Plaintiff "what did you swallow" and "was it fent[any]l?" (*Id.*, PageID.57.) As noted above, Plaintiff denied consuming any drugs; however, Defendant Melinowski informed Plaintiff that he would still be transported to an offsite hospital. (*Id.*) Plaintiff alleges that Defendant Melinowski was then "all over Plaintiff with questions, blood pressure cuff on arm, [and] taking temperature." (*Id.* (phrasing in original).) Plaintiff further alleges that Defendant Melinowski then stated that an IV would be started, and Plaintiff claims that "at this point, Melinowski [wa]s all over the place" and "in a frantic state." (*Id.*)

Plaintiff appears to fault Defendant Melinowski for performing the above-listed diagnostic tests and determining that Plaintiff needed an IV, and for acting with urgency when taking these actions. (*Id.*) However, "a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah*, 865 F.3d at 372 (citations omitted); *Mitchell*, 553 F. App'x at 605. Moreover, the Court notes that Plaintiff's later factual allegations in the amended complaint show that on March 13, 2022, Plaintiff's heart rate was very slow, and that after Plaintiff's arrival at Carson City Hospital, Carson City Hospital had to transfer Plaintiff to McLaren Hospital for pacemaker surgery. (Am. Compl., ECF No. 10, PageID.62, 63.) Under these circumstances, it was entirely reasonable, and

indeed the opposite of deliberately indifferent, for Defendant Melinowski to be acting with urgency while performing the above-listed diagnostic steps.

As to Defendant Unknown Party #1, Plaintiff alleges that after taking the above-listed diagnostic steps, Defendant Melinowski directed Defendant Unknown Party #1 to start Plaintiff's IV; however, Plaintiff alleges that Defendant Unknown Party #1 "[wa]s poking around [with the IV needle] as if incompetent." (*Id.*, PageID.57.) Although there may be instances when a medical provider's incompetency rises to such a level that the prisoner-plaintiff's constitutional rights are violated, *see, e.g.*, *Miller*, 408 F.3d at 819, based on the facts alleged in Plaintiff's amended complaint, this was not such an instance. Specifically, Plaintiff's factual allegations suggest that Defendants Melinowski and Unknown Party #1 acted with great urgency while providing medical care to Plaintiff on March 13, 2022, and this may have resulted in Defendant Unknown Party #1 "poking around" to insert the IV needle. (Am. Compl., ECF No. 10, PageID.57.) However, Plaintiff's allegation about Defendant Unknown Party #1 "poking around" does not show that Defendant Unknown Party #1 was "grossly incompetent" and provided inadequate medical care. (*Id.*); *Miller*, 408 F.3d at 819 (citation omitted). In short, Plaintiff fails to allege sufficient facts to show that Defendant Unknown Party #1 acted with deliberate indifference.

Further, Plaintiff alleges that at some point on March 13, 2022, Defendant Melinowski inserted a "saline syringe" in Plaintiff's IV and as Defendant Melinowski "pulled back on [the] syringe," this caused "an air bubble" to draw up inside the syringe." (*Id.*, PageID.59.) Plaintiff claims that Defendant Unknown Party #1 told Defendant Melinowski "you can't do that, there is air in the syringe." (*Id.*) Plaintiff believes that Defendant Melinowski acted "with [an] intent to murder/kill/cause harm by putting her arm against Plaintiff's body while using force to push down on [the syringe] plunger." (*Id.*, PageID.58.) And, Plaintiff believes that "these people," presumably

the Defendants present during this incident, "conspired to actually murder [him]." (*Id.*, PageID.59.)

As an initial matter, Plaintiff's conclusory assertion that Defendants were conspiring to murder him without any supporting *facts* is insufficient to show that Defendants acted with deliberate indifference. Furthermore, although Plaintiff contends that Defendant Unknown Party #1 raised concerns about the potential for air in the syringe, the fact that Defendant Melinowski continued to administer the saline solution does not in itself constitute deliberate indifference. The appropriateness of a particular medical treatment may be the proper subject of a malpractice suit; however, for the purposes of Plaintiff's present § 1983 suit, Plaintiff alleges no facts to suggest that Defendant Melinowski's actions were anything other than negligence, if that. For example, Plaintiff alleges no facts to suggest that he was harmed by Defendant Melinowski's action or that Defendant Melinowski's actions resulted in constitutionally inadequate medical treatment.

Finally, without providing any explanation, Plaintiff appears to fault Defendant Melinowski for turning on the defibrillator. (*See id.*, PageID.59, 60.) It is clear that Plaintiff's own interpretation of the actions of the medical Defendants on March 13, 2022, during Plaintiff's cardiac incident is that Defendants were purposely trying to harm Plaintiff; however, Plaintiff's own *factual* allegations in the amended complaint suggest that the actions of Defendants Melinowski and Unknown Party #1 were entirely consistent with them providing medical treatment to Plaintiff to address his apparent cardiac symptoms. Under these circumstances, as discussed above, Plaintiff's disagreement with Defendants Melinowski and Unknown Party #1 regarding their treatment decisions is insufficient to state an Eighth Amendment claim against these Defendants.

Accordingly, for all of the reasons set forth above, Plaintiff fails to state any Eighth Amendment claims against Defendants Melinowski and Unknown Party #1.

### 2.    *Defendant Leonard*

Plaintiff alleges that on March 13, 2022, after Plaintiff advised Defendant Leonard that Plaintiff had gone to healthcare due to chest pains, Defendant Leonard sent Plaintiff back to his housing unit before Plaintiff had been seen any medical providers. (*See id.*, PageID.56.) Shortly after Plaintiff returned to his housing unit, non-party Correctional Officer Lott told Plaintiff that he had "to go to [the] outside hospital," and Plaintiff returned to DRF's healthcare unit. (*Id.*)

At this early stage of the proceedings, the Court must take Plaintiff's factual allegations as true and in the light most favorable to Plaintiff. Although Plaintiff ultimately returned to DRF's healthcare unit shortly after Defendant Leonard ordered Plaintiff to return to his housing unit without seeing any medical personnel, and it is not entirely clear from Plaintiff's amended complaint whether the delay in Plaintiff's receipt of medical care that resulted from Defendant Leonard ordering Plaintiff to return to his unit caused any harm to Plaintiff, at this time, the Court will not dismiss Plaintiff's Eighth Amendment claim against Defendant Leonard regarding this interaction on March 13, 2022.

### d.    Top Bunk Assignment Upon Return to DRF

Plaintiff alleges that on March 18, 2022, when Plaintiff returned to DRF after receiving pacemaker surgery, Plaintiff was assigned to the same cell and the same top bunk as he was previously assigned, "despite requesting [a] bottom bunk." (Am. Compl., ECF No. 10, PageID.63.)

Plaintiff alleges no facts about any individuals who were involved in this assignment, let alone Defendants. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 555–61 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). And, any

"[s]ummary reference to a single, five-headed 'Defendants' [or staff] does not support a reasonable inference that each Defendant is liable . . . ." *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." (citation omitted)). Plaintiff fails to allege any facts to suggest that Defendants had any involvement in Plaintiff's bunk assignment at DRF on March 18, 2022. Under these circumstances, Plaintiff fails to state any claims against Defendants regarding his top bunk assignment on March 18, 2022.

### 6.    Fourteenth Amendment Claims

Plaintiff alleges that his use of the grievance procedure at DRF was impeded by the non-party grievance coordinator, and Plaintiff alleges that he alerted several non-parties to this issue. (*See* Am. Compl., ECF No. 10, PageID.64.) Based on these allegations, the Court construes Plaintiff's amended complaint to raise Fourteenth Amendment due process claims regarding his use of the grievance procedure at DRF.

As an initial matter, Plaintiff may not bring claims against non-parties to this suit. And, even setting this issue aside, various courts have repeatedly held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). And, Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994

WL 105907, at *1 (6th Cir. Mar. 28, 1994). Thus, because Plaintiff has no liberty interest in the grievance process, any response, or lack thereof, to Plaintiff's grievances did not deprive Plaintiff of due process.

Accordingly, Plaintiff's Fourteenth Amendment due process claims regarding his use of the grievance procedure at DRF will be dismissed for failure to state a claim.

### 7.    Section 1983 Civil Conspiracy Claims

In Plaintiff's amended complaint, he states that he believes that on March 13, 2022, Defendants "conspired to actually murder [him]." (Am. Compl., ECF No. 10, PageID.59.) The Court construes this allegation to raise a civil conspiracy claim under § 1983.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Here, Plaintiff does not specifically allege that any "agreement" or "plan" existed between Defendants. (*See generally* Am. Compl., ECF No. 10.) Instead, Plaintiff's allegations of conspiracy are wholly conclusory. Plaintiff has a subjective belief that Defendants were conspiring

against him on March 13, 2022, when he was accused of consuming drugs and then provided medical treatment for the symptoms that he was presenting at that time; however, Plaintiff alleges no *facts* that indicate the existence of a plan, much less that any Defendant shared a conspiratorial objective. Plaintiff's subjective belief and personal interpretation of the events, without supporting facts, are insufficient to show that Defendants engaged in a conspiracy. Indeed, Plaintiff's allegations, even viewed in the light most favorable to Plaintiff, describe discrete occurrences involving Defendants. Simply because Defendants each took various actions on March 13, 2022, does not show that they conspired to violate Plaintiff's constitutional rights.

As the United States Supreme Court has held, such allegations, while hinting at a sheer "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556–57. Instead, the Supreme Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567). Accordingly, because Plaintiff does not allege *facts* to show an agreement among Defendants, Plaintiff fails to state a plausible § 1983 civil conspiracy claim.

**B.      ADA and RA Claims**

Without providing any further explanation, Plaintiff references the ADA and the RA in his amended complaint. (Am. Compl., ECF No. 10, PageID.55.) In deference to Plaintiff's *pro se* status, the Court construes this reference to raise claims under the ADA and the RA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In the ADA, the term "disability" is defined as follows: "[1] a physical or

mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." *Id.* § 12102(2). Similarly, Section 504 of the Rehabilitation Act protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs "solely by reason of her or his disability." 29 U.S.C. § 794(a).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates, *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998), and the RA has also been found to apply to state prisons and inmates. *See, e.g.*, *Wright v. N.Y. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (discussing that "[b]oth the ADA and the RA undoubtedly apply to state prisons and their prisoners" (citation omitted). The proper defendant for Title II ADA claims and RA claims is the public entity or an official acting in his official capacity. *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002); *see, e.g.*, *Tanney v. Boles*, 400 F. Supp. 2d 1027, 1044 (E.D. Mich. 2005) (citations omitted). Plaintiff sues Defendants in their official and individual capacities. Because Plaintiff may not pursue ADA and RA claims against Defendants in their individual capacities, any intended ADA and RA claims against Defendants in their individual capacities will be dismissed.

As to Plaintiff's official capacity ADA and RA claims, the State of Michigan (acting through the MDOC) is not necessarily immune from Plaintiff's claims under the ADA or the RA. *See, e.g.*, *Tanney*, 400 F. Supp. 2d at 1044–47. The ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the Fourteenth Amendment[.]" *United States v. Georgia*, 546 U.S. 151, 159 (2006). If conduct violates the ADA but not the Fourteenth Amendment, then the Court must determine whether the ADA validly abrogates state sovereign

immunity. *Id.* At this stage of the proceedings, the Court will presume that the ADA validly abrogates state sovereign immunity for Plaintiff's ADA claims. Likewise, the Court assumes, without deciding, that Defendants are not immune from liability in their official capacities under the RA. *See, e.g.*, *Tanney*, 400 F. Supp. 2d at 1047 (citing cases).

Turning to the merits of Plaintiff's ADA and RA claims, as an initial matter, Plaintiff has failed to allege sufficient facts to show that he has a disability pursuant to the ADA or the RA. *See* 42 U.S.C. § 12102(2); *see also* 29 U.S.C. § 794(a). Moreover, even assuming Plaintiff had alleged sufficient facts to show that he has a disability pursuant to the ADA and the RA, Plaintiff's allegations do not show that he was excluded from a service or program, denied accommodation, or discriminated against due to his disability.

It is clear that Plaintiff disagrees with the medical treatment that he received; however, as the United States Court of Appeals for the Second Circuit has explained, "[w]here the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was 'discriminatory.'" *United States v. Univ. Hosp.* 729 F.2d 144, 157 (2d Cir. 1984). Indeed, that distinction explains why the ADA and the RA are not appropriate federal causes of action to challenge the sufficiency of medical care because "[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012); *see, e.g.*, *Baldridge-El v. Gundy*, No. 99-2387, 2000 WL 1721014, at *2 (6th Cir. Nov. 8, 2000) ("[N]either the RA nor the ADA provide a cause of action for medical malpractice."); *Centaurs v. Haslam*, No. 14-5348, 2014 WL 12972238, at *1 (6th Cir. Oct. 2, 2014) ("Although [Plaintiff] may have a viable civil rights claim under 42 U.S.C. § 1983 for inadequate medical care, he has failed to state a prima facie case under the parameters of the ADA."); *Powell v. Columbus Medical Enterprises,*

*LLC*, No. 21-3351, 2021 WL 8053886, at \*2 (6th Cir. Dec. 13, 2021) ("This dissatisfaction necessarily sounds in medical malpractice, which, 'by itself, does not state a claim under the ADA.'").[2]

In summary, Plaintiff's conclusory allegations of an ADA violation and an RA violation without specific supporting factual allegations fail to state a claim. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Therefore, Plaintiff's ADA and RA claims will be dismissed.

## Conclusion

The Court will grant Plaintiff leave to proceed *in forma pauperis* (ECF No. 2), and the Court will deny Plaintiff's request for the appointment of counsel (ECF No. 10, PageID.65). Further, having conducted the review required by the PLRA, the Court determines that Defendants Melinowski, Reno, Unknown Party #1, and Unknown Party #2 will be dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c), as applicable. The Court will also dismiss, for failure to state a claim, all claims against remaining Defendant Leonard *except* Plaintiff's individual capacity Eighth Amendment claim premised on Defendant Leonard ordering Plaintiff to return to his housing unit on March 13, 2022, without seeing any

---

[2] S*ee also Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006) ("Iseley . . . claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions."); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) ("[A] lawsuit under the Rehab Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions."); *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[I]t is well settled that the ADA [and the RA do] not provide a private right of action for substandard medical treatment." (internal quotation marks omitted)); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) ("The Rehabilitation Act, like the ADA, was never intended to apply to decisions involving . . . medical treatment.").

medical providers after Plaintiff had advised Defendant Leonard that he was at the healthcare unit due to chest pains.

An order consistent with this opinion will be entered.


Dated:   August 19, 2025                          /s/ Ray Kent
                                                 Ray Kent
                                                 United States Magistrate Judge